# United States Tax Court

T.C. Memo. 2024-79

LAWRENCE LEROY HENRY,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 24155-18.                    Filed August 22, 2024.

————————

During 2011 through 2014, the years at issue, P and W owned and operated several businesses that provided tax and financial services to clients. P's primary source of income was P's business SBP, a bill pay service that allowed clients of P to use credit cards to pay expenses that otherwise required cash or check payments. P and W did not keep records, and they intermingled their personal and business expenditures. P failed to file tax returns for tax years 2011 through 2014. For those years, R conducted a bank deposit analysis and determined deficiencies in tax totaling over $1.7 million as well as additions to tax for failure to file, fraudulent failure to file, and failure to pay estimated income tax. R issued Notices of Deficiency ("NODs") to P and W. In 2018 P filed a timely petition disputing the NODs, but W failed to timely file a petition. In 2019 P and W submitted late returns for 2011 through 2014. In this case R accepted the income as reported on the late returns; R denied many of the deductions claimed on the returns but allowed some; and R newly asserted income from cancellation of indebtedness.

*Held*: P is not liable for cancellation of indebtedness income, because that issue was "new matter" as to which R bore the burden of proof under Rule 142(a)(1), but R

**[\*2]**  failed to prove that P was not insolvent at the time the debt was canceled.

*Held, further*, P substantiated and is entitled to deduct business expenses in amounts slightly larger than those conceded by R; but P failed to substantiate most of the expenses in dispute.

*Held, further*, R did not prove by clear and convincing evidence that P's failure to file returns was fraudulent for purposes of the I.R.C. § 6651(f) addition to tax for fraudulent failure to file, so P is not liable for that addition to tax.

*Held, further*, P is liable for additions to tax under I.R.C. §§ 6651(a)(1) (for non-fraudulent failure to timely file), 6651(a)(2) (for failure to pay tax), and 6654 (for failure to pay estimated tax).

————————

Lawrence Leroy Henry, for himself.

*Mary Ellen Goode*, *Rachel L. Gregory*, *Ryan A. Ault*, and *William J. Gregg*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, *Judge*:  Pursuant to section 6212,[1] the Internal Revenue Service ("IRS") issued a statutory notice of deficiency ("NOD") to petitioner Lawrence L. Henry on September 6, 2018, determining the following deficiencies in federal income tax and additions to tax for the four years 2011 through 2014:

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code ("the Code"; Title 26 of the United States Code) as in effect at the relevant times; references to regulations are to Title 26 of the *Code of Federal Regulations* ("Treas. Reg.") as in effect at the relevant times; and references to Rules are to the Tax Court Rules of Practice and Procedure.  Some dollar amounts are rounded.

| [*3] Tax year | Deficiency | Additions to Tax | | |
|---|---|---|---|---|
| | | *§ 6651(f)* | *§ 6651(a)(2)* | *§ 6654* |
| 2011 | $340,808 | $247,085.80 | $85,202.00 | $6,747.25 |
| 2012 | 398,802 | 289,131.45 | 99,700.50 | 7,149.85 |
| 2013 | 571,561 | 414,381.73 | – | 10,263.47 |
| 2014 | 413,694 | 299,928.15 | – | 7,428.66 |
| **Total** | **$1,724,865** | **$1,250,527.13** | **$184,902.50** | **$31,589.23** |

In addition to determining a fraudulent-failure-to-file addition to tax under section 6651(f) for each of the years (as stated in the table above), the NOD determined in the alternative for each year an addition for non-fraudulent failure to timely file under section 6651(a)(1).

Mr. Henry filed a timely petition under section 6213(a) for redetermination of the deficiencies and additions to tax. After the parties' concessions,[2] there are four remaining issues for decision: (1) whether Mr. Henry must recognize cancellation of indebtedness income; (2) the amount of deductions to which Mr. Henry is entitled; (3) the proper allocation of Mr. Henry's income and deductions to Schedule C, "Profit or Loss From Business", or Schedule E, "Supplemental Income and Loss"; and (4) whether Mr. Henry's failure to file his returns was fraudulent for purposes of section 6651(f).[3]

---

[2] See "Stipulation of Settled Issues" (Doc. 612), resolving filing status, personal and dependent exemptions, child tax credit, the amount of cancellation of indebtedness income (but not the related insolvency question), net operating loss ("NOL") carryforward from 2010, and portions of the "Savvy Bill Pay" expenses.

[3] As to the additions to tax under sections 6651(a)(2) and 6654 and the alternative addition under section 6651(a)(1), Mr. Henry's opening brief filed in August 2023 (Doc. 624 at 35–37, 57–58) argues "reasonable cause" for his failures to file returns, timely pay, and timely pay estimated tax. However, there is no "reasonable cause" exception for the section 6654 addition for failure to pay estimated tax; and in May 2023 Mr. Henry expressly stipulated (*see* Doc. 612 paras. 9–10) that he does not have "reasonable cause" for these failures. He has not requested nor been granted leave under Rule 91(e) "to qualify, change, or contradict" that stipulation, so we need not address the issue of reasonable cause, and we treat it as conceded by stipulation.

[*4]                    FINDINGS OF FACT

At the time he filed his petition, Mr. Henry resided in Maryland. The facts below are based on the parties' stipulations (including the exhibits attached thereto) and the testimony and additional exhibits admitted at trial.[4]

*Mr. Henry and his businesses*

In the years at issue, Mr. Henry and his wife, Sherrie Hunter-Henry,[5] owned and operated four nominally distinct but operationally intertwined businesses: L&S Marketing Concepts ("L&S Marketing") was, during all the years at issue, an S corporation of which Mr. Henry was the sole shareholder and which served as a sort of holding company for the other three businesses. L&S Business Solutions, LLC, was a general partnership that consisted only of Mr. Henry, who had a 1% interest, and Ms. Hunter-Henry, who had a 99% interest, and L&S Business Solutions had common accounts with L&S Marketing.[6] Savvy King and Savvy Bill Pay were services that Mr. Henry offered under L&S Marketing. That is, Mr. Henry understood that each of "L&S, Savvy Bill Pay, and Savvy Consulting is an entity under L&S Marketing Concepts." The Henrys used the same bank account for all of their businesses and commingled their business and personal assets.

---

[4] The parties submitted 11 stipulations with exhibits, and Mr. Henry complicated the record by making voluminous submissions and resubmissions of exhibits. The exhibits admitted into evidence are listed in the appendices attached to our order of May 3, 2023 (Doc. 611).

[5] The IRS issued similar NODs to Mr. Henry (on September 6, 2018) and to Ms. Hunter-Henry (on August 28, 2018). The petition, which was mailed to the Court on December 4, 2018, named both of them as petitioners, but it was timely only as to Mr. Henry and was untimely as to Ms. Hunter-Henry. We therefore dismissed Ms. Hunter-Henry for lack of jurisdiction by our order (Doc. 08) of May 16, 2019. The following findings of fact include reference to Ms. Hunter-Henry because both members of the couple were involved in the activities that gave rise to the income at issue here. We sometimes refer to the couple collectively as "the Henrys".

[6] We do not need to attempt to allocate income and deductions between Mr. Henry and Ms. Hunter-Henry. During the pendency of this case the Henrys signed and submitted to the IRS joint returns that reported income and deductions of all four businesses, and Mr. Henry's position in his post-trial briefs is consistent with those joint returns.

[*5] *The Henrys' children as contractors*

Ms. Hunter-Henry has five adult children—Burnice Cain, Burnell Cain, Verdell Smalls, Velma Blackstone, and Lawrence M. Henry—and Mr. Henry is the father of some of them. The Henrys provided money to the children. To an extent we cannot determine, some of this money may have been in return for work that the children performed for Mr. Henry's various businesses—characterized as "casual labor" on one of Mr. Henry's lead sheets. While they sometimes compensated the children with cash, the Henrys also sometimes provided "payment[s] in lieu of cash". As Ms. Hunter-Henry explained:

> I had the five children and if I paid for their—if I paid them in cash, they may not pay their bills . . . . I make each kid work off any bills that I paid for them. So they say ["]Mom, my cell phone about to be cut off["], I'm not giving you no free money. I got plenty of work for you and you're qualified to do it, knock it out. So I won't issue them payroll, I will pay that bill for them.

Mr. Henry did not show that Form W–2, "Wage and Tax Statement", or any version of Form 1099 was prepared or filed for the years at issue for any cash payments or payments in lieu of cash. For 2012 Mr. Henry submitted a payroll log for January through March that details work performed by Velma Blackstone and Lawrence M. Henry in the total amount of $500. For reasons stated in Part II.D.7.b, we find that Mr. Henry made only $500 of deductible payments for "casual labor" to his children.

*Casual labor by non-family*

In addition to payments made to his and his wife's children, Mr. Henry claims deductions for payments to several individuals, to whom he referred as "contractors", for "casual labor" allegedly performed for the Henrys' businesses. Mr. Henry alleges that he paid his contractors through PayPal after receiving invoices from them for work performed for his businesses. At trial he offered bank statements that do list payments made through PayPal, and he claims that these payments were made to those contractors. However, at trial Mr. Henry was unable to distinguish PayPal payments made to contractors from other payments he made through PayPal. Mr. Henry could not say whether he had ever prepared Forms W–2 or Forms 1099 for his contractors, and he offered no such forms into evidence. We are

[*6] generally unable to conclude whether these payments were in fact for services and, if they were, whether they were services performed for the businesses. Moreover, at least two of the children used credit cards tied to the Henrys' businesses and issued in the children's names.

The only exception to this failed proof concerns payments made to Robert Half International, an apparent "temp agency", for work performed by Nancy Villalobos in 2012. Mr. Henry submitted invoices from Robert Half International as well as bank statements showing payments to Robert Half International. While it appears that Mr. Henry was behind on his payments to Robert Half International, his bank statement shows a total of $781 paid to the temp agency. Therefore, for the reasons stated in Part II.D.7.a, we find that Mr. Henry may deduct only $781 for "casual labor" performed by his "contractors".

*Referral fees*

Mr. Henry claims that he made payments of $300 each for three referrals in 2011 ($900 total) to individuals who referred new clients to his business. For reasons stated in Part II.D.8, we cannot tell the actual nature and purpose of these expenditures, and we disallow this claimed deduction.

*Savvy King and Savvy Bill Pay*

The Henrys recruited clients for Savvy King and L&S Business Solutions through weekly seminars in California and Maryland. Savvy King was a consulting service through which clients could learn to "pay the IRS without using their own money." Clients paid a monthly fee for this consulting service. One element of Savvy King's purported "tax strategy" is to use bank float to allow clients to pay regular expenses with a credit card without incurring a fee or paying interest on a cash advance. (We do not discern a tax-related strategy in this procedure.)

Mr. Henry created Savvy Bill Pay to create this "bank float". Through Savvy Bill Pay, the client designated the payee and amount owed for each bill to be paid and paid Mr. Henry using a credit card, and Mr. Henry then paid the payee using a check or a debit card. Clients paid a merchant fee for each transaction through Savvy Bill Pay as well as a $3.50 administrative fee.

[*7]    The amounts of deductions[7] for Savvy Bill Pay payments made on behalf of clients as claimed by Mr. Henry, as conceded by the Commissioner, and as still in dispute are as follows:

| Tax year | Petitioner's claimed deduction | The Commissioner's concession | Difference |
|---|---|---|---|
| 2011 | $669,133 | $531,317 | $137,816 |
| 2012 | 874,523 | 496,480 | 378,043 |
| 2013 | 1,158,015 | 707,849 | 450,166 |
| 2014 | 768,802 | 581,941 | 186,861 |
| **Total** | **$3,470,473** | **$2,317,587** | **$1,152,886** |

*L&S Business Solutions*

L&S Business Solutions is a limited liability company established in 1999 by the Henrys.  L&S Business Solutions provided general accounting and tax services for either a flat fee or a bundled monthly fee, depending on the services selected by the client.  Advertised services include bookkeeping for businesses and consultations with a "tax specialist" on everything from IRS audit representation to liens and levies.

Mr. Henry helped Ms. Hunter-Henry to set up a website for L&S Business Solutions, and he attended her sessions with clients and prospective clients.  He was aware that her presentations included "recommended Tax Saving Strategies" such as: "[s]plitting income among several family members or legal entities in order to get more of the income taxed in [a] lower bracket" and "[f]inding tax deductions by structuring your money to pay for things you enjoy, such as a vacation home."  He helped Ms. Hunter-Henry prepare video presentations in which she explained:

> [W]e teach you what is tax deductible, and help you convert
> your personal life into your business life and write it all off.
> Okay. We call it anyway expenses. You gonna eat anyway,
> ya might as well write it off, talk business.

---

[7] Both parties treat clients' payments to Savvy Bill Pay as gross income of the business and treat Savvy Bill Pay's payments on behalf of clients as deductions of the business.  In view of this consensus, we do not address the theoretical propriety of this method of accounting but assume that it is proper.

[*8] She explained that "gifts" are a big category for business tax write-offs and stated: "[I]f I do not have a corporation, I can do gift cards, twenty-five bucks a gift card, right, now we are under the limit, how many do [you] give [your relative]? It is up to you." She bragged: "I've been losing money how long, how many, 15 to 20 years *on paper*." (Emphasis added.) The advice of L&S Business Solutions—with which Mr. Henry was familiar—included instruction about a taxpayer's return-filing and record-keeping obligations.

*Bookkeeping and record-keeping*

Mr. Henry did not maintain any books or records, general ledgers, or profit and loss statements, or use any accounting software for his various businesses at any time during the years at issue. Instead, the Henrys relied on bank and credit card statements (including statements for cards issued to and used by at least two of his children) and online statements from Savvy Bill Pay to differentiate personal and business expenses, and they then aggregated totals to report on their (late) tax returns. This disarray is reflected in Mr. Henry's submitted evidence, which amounted to hundreds of filings consisting of thousands of pages of bank statements and faded receipts bearing handwritten notes and highlights. And, even with these thousands of pages, Mr. Henry is often able to provide only an "example" of an expense he claims (e.g., receipts for food allegedly provided to clients at one seminar, which he used as an example in order to attempt to substantiate a year's worth of "refreshment" expenses).

*Gross income*

The amounts of Mr. Henry's gross income from these businesses are no longer in dispute. His late returns reported income amounts totaling as follows:

| Tax year | Amount |
|----------|--------|
| 2011 | $913,815 |
| 2012 | 1,061,925 |
| 2013 | 1,326,475 |
| 2014 | 907,474 |
| **Total** | **$4,209,689** |

Before Mr. Henry filed those returns, the IRS had conducted a bank deposit analysis that yielded higher totals, and those higher totals were

9

[*9] used in the NODs.  However, in his opening brief the Commissioner "stipulates to the total taxable income in the amounts admitted to by petitioner." (Doc. 623 at 42 n.4.)

*Cancellation of indebtedness and insolvency*

In two of the years at issue, debts against Mr. Henry were canceled in the following amounts:

| Tax year | Amount |
|---|---|
| 2011 | $281,398 |
| 2012 | 41,061 |
| **Total** | **$322,459** |

This issue was not raised in the IRS's NODs (nor in the Commissioner's Answer in this litigation).  Mr. Henry does not dispute that debts were canceled in these amounts, but he maintains that he was insolvent at the time the debts were canceled.  For the reasons explained below in Part II.A, we find that he was insolvent.

*Ayer's Place rental unit*

Mr. Henry and Ms. Hunter-Henry received payments of $15,000 per year in connection with a rental unit (Ayer's Place property) during all four years at issue (totaling $60,000).  The rent amounts they received were reported to the IRS on a Form 1099 as rental income, and Mr. Henry reported the $15,000 as rental income on his tax returns. Mr. Henry now claims that the amount reported as rental income is not rental income at all but is instead a repayment of a loan that the Henrys supposedly made to a group of eight to ten "investors" in order to help an individual "manage" their Ayer's Place property.  The Henrys allegedly contributed $100,000 to this investment pool and (they say) subsequently collected rent as repayment of the $100,000.  Mr. Henry also paid for alleged repairs to the unit in order to maintain its habitability.  Mr. Henry contends that the $60,000 of rental income should be recharacterized as a nontaxable loan repayment and that he should be allowed deductions for the cost of repairs to the unit.  For the reasons stated in Part II.B, we find that Mr. Henry received $60,000 of taxable rental income, and for reasons stated in Part II.E, we find he did not substantiate his claimed deductions for repairs.

[*10] *Expense for office space and home office*

The Henrys operated their businesses first out of their residence and out of a professional office in California and later out of their residence and out of a professional office in Maryland.  In Maryland Mr. Henry paid for a professional office space managed by Brightleaf Properties (which had previously been named Treetops Atrium).  In California Mr. Henry paid for a professional office space managed by Essex Realty.  For the reasons set out below in Part II.D.6, we find that Mr. Henry incurred the following amounts for office rent:

| Tax year | Amount |
|----------|--------|
| 2011 | $29,423 |
| 2012 | 8,842 |
| 2013 | 4,710 |
| 2014 | 13,405 |
| **Total** | **$56,380** |

However, we are unable to find as a fact that any portion of either of Mr. Henry's residences was used exclusively for business.

*Merchant banking fees*

A business incurs "merchant banking fees" when a bank processes electronic payments made to the business.  The Commissioner conceded the existence and deductibility of such fees incurred by Mr. Henry's businesses to the extent of the amounts in Mr. Henry's bank statements that contain the words "BankCard", "Mtot Disc", "Discount", and "Indn", because these abbreviations, according to the Commissioner, indicate a merchant banking fee.  The amounts claimed by Mr. Henry and the somewhat smaller amounts conceded by the Commissioner are as follows:

| Tax year | Amount claimed by Mr. Henry | Amount conceded by the Commissioner | Difference |
|----------|-----------------------------|-------------------------------------|------------|
| 2011 | $23,270 | $22,579 | $691 |
| 2012 | 27,727 | 27,564 | 163 |
| 2013 | 34,730 | 27,742 | 6,988 |
| 2014 | 21,593 | 20,257 | 1,336 |
| **Total** | **$107,320** | **$98,142** | **$9,178** |

[*11] Mr. Henry claims, in addition to the amounts reported on his returns, an additional $817 for 2011 and $2,523 for 2013 for alleged merchant banking fees associated with American Express and Authorize.net. For reasons stated in Part II.D.1, we find that Mr. Henry incurred only those merchant banking fees conceded by the Commissioner.

*Bank service fees*

Mr. Henry incurred (and claimed the following deductions for) bank service fees, which included the monthly fee for his bank account, overdraft fees, chargeback fees, and transfer fees (of which the Commissioner conceded $359 in each year):

| Tax year | Amount claimed by Mr. Henry | Amount conceded by the Commissioner | Difference |
|----------|----------------------------:|------------------------------------:|-----------:|
| 2011 | $2,209 | $359 | $1,850 |
| 2012 | 1,647 | 359 | 1,288 |
| 2013 | 3,468 | 359 | 3,109 |
| 2014 | 22,896 | 359 | 22,537 |
| **Total** | **$30,220** | **$1,436** | **$28,784** |

For the reasons stated below in Part II.D.2, we find that Mr. Henry incurred $359 of bank service fees for each year at issue.

*Taxes, licensing, and business insurance*

Mr. Henry had business insurance during all the years at issue. After he moved his business to Maryland, he filed articles of incorporation with the state and registered a trademark. Mr. Henry claims a deduction for the business insurance premiums and "Taxes and Licensing". For reasons stated in Part II.D.10, we allow a deduction for business insurance as well as the fees to file articles of incorporation and to register a trademark.

**[\*12]**

| Tax year | Taxes and license fees | | Business insurance |
|---|---|---|---|
| | Claimed | Amount for licenses | |
| 2011 | $500 | 0 | $492 |
| 2012 | 0 | 0 | 445 |
| 2013 | 328 | $328 | 445 |
| 2014 | 63 | 0 | 445 |
| **Total** | **$891** | **$328** | **$1,827** |

*Advertising and web hosting*

Mr. Henry claims deductions for advertising and web hosting for all years at issue. Without any testimony to support most of the advertising expenses, we are able to allow only those expenses for which we find support through testimony and briefs. Thus, we find deductible advertising expenses only for payments made to entities whose names seem to be clearly related to the one form of advertisement discussed through testimony: signs. Thus, we find that Mr. Henry made deductible payments to entities such as "Fast Signs" and "OnlineSign."

Mr. Henry's "marketing" expenses, insofar as we are able to discern from testimony and briefs, are actually web hosting expenses related to maintaining the website for Mr. Henry's businesses. After reviewing Mr. Henry's evidence to support his web hosting expenses, we find that amounts paid to "GoDaddy", "Domain Hosting", "OneWebHosting.com", and "DiscountASP.Net" were for business expenses. The first three entities listed are those whose names seem to relate to domain hosting, and those deductions are supported by the testimony of Mr. Henry and Ms. Hunter-Henry. For DiscountASP.Net Mr. Henry submitted invoices as well as a statement that listed the yearly expenses he incurred for the domain name "savvybillpay.com".

**[*13]**

| Tax year | Advertising | | Web hosting | |
|---|---|---|---|---|
| | Claimed | Amount related to signs | Claimed | Amount related to web hosting |
| 2011 | $6,390 | $1,131 | $2,134 | $681 |
| 2012 | 6,199 | 3,745 | 937 | 436 |
| 2013 | 2,216 | 127 | 1,871 | 992 |
| 2014 | 3,076 | 0 | 3,974 | 729 |
| **Total** | **$17,881** | **$5,003** | **$8,916** | **$2,838** |

*Travel, meals and entertainment, business gifts, and listed property*

Mr. Henry claims that for the purposes of his business he incurred (and he therefore claims deductions for) travel, hotel accommodations, metro fare, bus fare, meals, car payments (including insurance, gas, and tolls), and multiple gifts to clients. We find that Mr. Henry incurred expenses for hotel rooms that he used for meetings to recruit clients. However, for the reason set out below in Part II.D.4, we are unable, on the evidence presented, to find that he incurred the remaining expenses in the conduct of his businesses.

*Cell phones and landlines*

Mr. Henry, during any given year at issue, had at least one landline and three cell phones which he allegedly used for business.[8] He reports for each year the amounts of these expenses indicated below (and we allow the lesser amounts indicated):[9]

---

[8] Mr. Henry also mentions for the first time in his opening brief (Doc. 624) a claimed deduction for an "inbound call center". However, we have before us no testimony, discussion, or even an allusion on his lead sheet to any expense relating to an inbound call center. Therefore, we do not allow any deduction for it.

[9] The amounts in this table are aggregated totals for each year, as Mr. Henry separately listed "Business Cellular" and "Business Cellular 2", in his lead sheets, for example. Some amounts in Mr. Henry's "Landline" column are described as including internet. But, because of a lack of monthly statements for these amounts, we are unable to discern what, if any, of the amounts were paid for internet.

**[*14]**

| Tax year | Cell phones | | Landline | |
|---|---|---|---|---|
| | Claimed | Allowed | Claimed | Allowed |
| 2011 | $9,832 | $5,406 | $2,624 | 0 |
| 2012 | 2,234 | 1,656 | 2,214 | 0 |
| 2013 | 2,638 | 1,656 | 3,641 | $3,641 |
| 2014 | 890 | 0 | 4,086 | 0 |
| **Total** | **$15,594** | **$8,718** | **$12,565** | **$3,641** |

Mr. Henry offered into evidence monthly invoices for only one of the cell phone plans under the name of Mr. Henry's business: a Sprint plan from 2011–2013 for which Mr. Henry paid $5,406 in 2011 and $138 per month in 2012 and 2013. He offered no statements for cell phone expenses in 2014. Regarding landline expenses, he offered monthly invoices for a Verizon landline plan under Ms. Hunter-Henry's name for service at her and Mr. Henry's professional address in California in 2013 for which they paid $3,641. He offered no invoices for landline expenses at a professional address for 2011, 2012, or 2014. For the reasons stated in Part II.D.5, we find that Mr. Henry incurred business cell phone expenses of $5,406 for 2011 and $3,312 per year for 2012 and 2013, and $3,641 in landline expenses for his business for 2013.

*Clothing*

Mr. Henry claims a deduction for the purchase and dry cleaning of clothing, which he labels as a cost for "uniforms". As evidence, Mr. Henry submitted faded receipts from Dress Barn and a dry cleaning business. For the reasons stated in Part II.D.9, we disallow any deduction related to "uniforms".

*Charitable contributions*

Mr. Henry claims deductions for alleged contributions to the Nation of Islam, to Louis Farrakhan individually, and to "Scarlet Saints", an entity about which we do not have information, in the amounts listed here, but he offered into evidence receipts only for Nation of Islam contributions and only in the amounts stated here:

**[\*15]**

| Tax year | Nation of Islam | | Louis Farrakhan | Scarlet Saints |
|---|---|---|---|---|
| | *Claimed* | *Amount supported by receipts*[10] | | |
| 2011 | $1,625 | $800 | $871 | $100 |
| 2012 | 245 | 20 | 0 | 0 |
| 2013 | 992 | 340 | 0 | 0 |
| 2014 | 1,605 | 0 | 0 | 0 |
| **Total** | **$4,467** | **$1,160** | **$871** | **$100** |

On the Forms 1040, "U.S. Individual Income Tax Return", that Mr. Henry submitted to this Court, Mr. Henry took the standard deduction for 2011 through 2013; we do not have a Form 1040 for 2014. We find that Mr. Henry made charitable contributions in amounts totaling $1,160 (but for the reasons stated in Part II.F, he is not entitled to deduct them).

*Mr. Henry's late filing of tax returns*

In the Henrys' household, Ms. Hunter-Henry is the spouse principally responsible for preparing and filing tax returns. She has been to law school, and she has been in the business of preparing tax returns and giving tax advice. Mr. Henry, by contrast, has only a high school diploma, and he deferred to Ms. Hunter-Henry. She told him (incorrectly) that they were experiencing net losses from year to year, that the losses would result in their not having tax liabilities for the years at issue, and that therefore it would ultimately not be a problem that their returns were overdue.

With Ms. Hunter-Henry in charge of tax compliance, the Henrys did not file timely returns for the three pre-suit years 2008, 2009, and 2010 (each of which was, under an extension, due in October of the following year). Instead, they filed those returns years late in October

---

[10] On several of the receipts, which appear to be carbon copies, there are some notes written in ink pen that purport to indicate an additional amount paid in cash by Mr. Henry. We do not consider these notes to qualify as contemporaneous written acknowledgments ("CWA") by the donee, because they were added after the execution of the receipt, and we cannot know when or by whom the notes were added to the receipts. Consequently, we disregard them for purposes of determining Mr. Henry's allowed charitable contribution deductions.

**[\*16]** and November 2017 (which was after the commencement of the audit described below). On the 2010 return they claimed an NOL of $945,801. After examination the IRS duly mailed to the Henrys an NOD that made various adjustments (including disallowance of the NOL) and determined for each year a tax deficiency and an addition to tax under section 6651(f) for fraudulent failure to timely file. Mr. Henry did not receive the NOD, and he did not file in the Tax Court a petition to challenge the deficiency determinations for those pre-suit years.

Similarly, under the leadership of Ms. Hunter-Henry, the Henrys did not file timely returns for any of the four years at issue (2011–2014). In fact, the Henrys did not file returns for those years until April 2019— i.e., after the IRS completed its audit and issued its NOD, and after Mr. Henry commenced this case.

*IRS audit*

Although the IRS received no timely returns from the Henrys for 2011–2014, it did receive information about them. Each year the credit card companies with which the Henrys maintained their merchant accounts issued to the Henrys Forms 1099 reporting the companies' payments to the Henrys, and the IRS also received such third-party reporting. Consequently, in 2016 the IRS commenced an examination of the Henrys, for which Ms. Hunter-Henry did most of the communicating with the IRS.

The IRS's audit included a bank deposit analysis. As a result of that analysis, the IRS determined that the Henrys had gross receipts of roughly $1 million or more for each of the years 2011 through 2014. After minimal deductions (only the standard deduction, the self-employed adjustment, and personal exemptions were included because of the Henrys' failure to file returns), the IRS determined total increases in adjusted gross income of $912,983, $1,066,783, $1,353,889, and $988,150 for those years. Pursuant to section 6020(b), the IRS prepared for each of the years 2011–2014 a substitute for return ("SFR") dated May 10, 2018, that reflected these amounts.

*Notice of deficiency and petition*

The Commissioner issued an NOD to Ms. Hunter-Henry on August 28, 2018, and to Mr. Henry on September 6, 2018, determining the deficiencies and additions to tax and penalties set out above in the table at page 3.

**[\*17]** The NODs made no adjustments increasing income in the amounts of the debts canceled in 2011 and 2012.

*The parties' pleadings in Tax Court*

Ms. Hunter-Henry prepared a petition which they mailed to the Tax Court on December 4, 2018—untimely as to her NOD but timely as to Mr. Henry's. At that time Mr. Henry resided in Maryland. As we understand the petition, it puts at issue all the adjustments in the NOD. It makes no mention of cancellation of indebtedness. (Several months later, in April 2019, the Henrys filed their income tax returns for the years at issue, 2011–2014. Forms 982, "Reduction of Tax Attributes Due to Discharge of Indebtedness (and Section 1082 Basis Adjustment)", filed with the returns for 2011 and 2012 claimed exclusion of the canceled indebtedness as "insolvent".)

The Commissioner filed his answer, which defended the adjustments in the NOD and made affirmative allegations in support of the determination that Mr. Henry's failure to file timely was attributable to fraud. The answer makes no mention of cancellation of indebtedness income.

*Pretrial activity and three continuances*[11]

This case was first set for trial in January 2020—more than a year after the petition had been filed—but Mr. Henry filed a motion for a continuance, explaining: "In the process of copying all of the supporting tax documentation for trial, we found to[o] many missing tax deductions that need to be included with this case. We still need to reconcile 2 large bank statements that were prepared by the same bookkeeper, to make sure we're not missing more deductions, then we need to update each of the categories, and rerun adding machine tape to get to the new totals for the tax returns." (It is not clear how this explanation can be reconciled with the fact that the tax returns for the years at issue had been filed in April 2019.) The Commissioner did not object, and we granted the continuance.

---

[11] We decide several issues on the basis that Mr. Henry had the burden of proof and failed to substantiate his position with evidence. Because Mr. Henry suggests that he should be permitted to rely on evidence that we excluded and should be permitted to provide additional evidence that he did not have a chance to offer at trial, we set out in detail the course of the activity leading up to the trial of this case.

[*18] The trial was then set for a year later, in January 2021, but the Commissioner filed a motion for another continuance, explaining that the parties were making progress in stipulating the facts of the case but that Mr. Henry "has submitted a large volume of documents to the Commissioner which have not yet been included in a proposed stipulation" and "has further informed respondent that additional documents will be provided with respect to the issue of a loss carryforward which petitioner intends to raise as an issue in the case". We granted the second continuance.

The case was set for trial 11 months later at a session in December 2021. The parties continued working on stipulations of fact (*see* Docs. 38, 39, 41); but in November 2021 Mr. Henry filed a motion (Doc. 43) for another continuance, explaining his continuing efforts to obtain information and provide it to the Commissioner. He also stated that he "wishes to hire an attorney and the attorney needs more time than 30 days, and Petitioner wishes to give notice to potential witnesses to validate their Savvy Bill Pay transactions, claimed as an expense of the Petitioner." (No attorney ever entered an appearance for Mr. Henry, and at the eventual trial in August 2022 Mr. Henry called no witnesses.) The Commissioner objected to the continuance, and we initially denied it, observing that "[t]his case has previously been set for trial and then continued on two occasions (see Docs. 17, 29), and it seems unlikely that the postponement of this current (third) setting and the setting of a fourth would have any significant effect."

We served an order (Doc. 192) requiring that the parties appear remotely (via Zoomgov) for the calendar call set for December 13, 2021, and that they appear in person for trial on December 14, 2021. Before that date Mr. Henry electronically submitted scores of proposed exhibits, but in doing so he failed to comply with our instructions. Among other things, he submitted exhibits without exhibit numbers and without sequential page numbering, and sometimes misfiled documents as if they had been submitted by both parties (rather than by Mr. Henry alone). We explained the Court's instructions and ordered Mr. Henry to comply with them. (Doc. 401.) The parties successfully filed additional stipulations with exhibits. (*See* Docs. 401–414.) Mr. Henry also filed or refiled additional proposed exhibits. (Docs. 428–431, 441–446.)

Three days before the trial session set for December 13, 2021, Mr. Henry filed another motion (Doc. 436) for a continuance, stating that he "wishes to have more time to respond to Respondents request to include Tax years 2004, 05 and 10 based on Respondent's Pre-Trial

**[\*19]** Memorandum. Petitioner will have to scan and upload 30 more 3[-inch] Tax binders that also have to be redacted." He also filed a motion (Doc. 439) to strike "thousands" of his previously filed exhibits so that he could "have more time to redact[] thousands of account numbers displayed on thousands of documents uploaded." (That is, in disregard of Rule 27(a), he had previously failed to redact from his exhibits bank and credit card account numbers and social security numbers.) During the December 13 calendar call, we ordered that the trial would be continued for a third time and that the December 14 session would be a pretrial hearing. (*See* Doc. 449.)

At the remote hearing on December 13 and the in-person hearing on December 14, the Court spent about four hours with the parties, time that was largely spent on attempting to assist Mr. Henry in preparing and filing his documents for eventual admission into evidence and to assist him in doing so in a manner that would make it possible to demonstrate that those documents support his contentions about the amounts in dispute in the case. (Much of the complication seemed to involve pre-suit years, for which Mr. Henry intended to submit thousands of documents to prove NOLs that would carry forward into the years at issue. He later gave up on that project, and we struck from the record the documents related to the NOLs.) For example, we explained:

> I know, Mr. Henry, that you don't have the misunderstanding I'm about to describe, but I'm going to give an extreme example just to make a point. A Petitioner couldn't prove his case by filling up a truck with relevant documents and driving over here and dumping them into the courtroom and saying to the judge, ["]it's all in there, decide the case in my favor["]. It turns out that the burden of proof means more than the physical burden of getting the papers into the courtroom, it's the burden of demonstrating from the evidence that you're entitled to prevail.

> So getting the documents before the Court either physically in paper or electronically is an important step, but I can't figure out how these documents relate to what the parties are disputing unless the parties show me.

> In doing that, making that kind of showing in a case with thousands of pages of documents is a challenge.

**[\*20]** (Tr. at 6:10–7:1.) In particular, we urged Mr. Henry to consider preparing spreadsheets that would show, for each type of deductible expense in each year, the amount of each expenditure and the source document that substantiated the nature and amount of that expenditure. (*See, e.g.*, Doc. 454 at 17–18; Doc. 455 at 21–29, 32–36, 63–66.) We referred to possibility of a true "summary" exhibit under Rule 1006 of the Federal Rules of Evidence, and we acknowledged that such a spreadsheet that is not a Rule 1006 summary might nonetheless be admitted as demonstrative evidence. (Doc. 454 at 28–29.) Mr. Henry had many documents that he called "lead sheets", which tallied various expenses, but we explained—and Mr. Henry professed to understand—that the numbers on the lead sheets "have to be backed up". (Doc. 455 at 63.) It was clear even then (*see* Doc. 455 at 36, 40–41, 68) that the most difficult subject for presenting verifiable proof was the Savvy Bill Pay expenditures.

During the hearing on December 14, 2021—the date that had previously been set for the (now continued) trial of the case—Mr. Henry stated that he had additional documents that he would need to submit as evidence. (Doc. 455 at 16–17.) When the trial had been set for December 13, 2021, Mr. Henry had a deadline for exchanging exhibits with an opponent by November 29, 2021 (*see* Doc. 36), and if the trial had gone forward on December 14, he would have been precluded from using any documents not exchanged by that date. But our continuing the case for the third time mooted that deadline, and we set a series of deadlines for Mr. Henry's further production of documents. (*See* Doc. 450.)

Three months later the Commissioner filed a status report (Doc. 479) complaining that he was unable to make additional concessions, prepare a stipulation of settled issues, or prepare additional stipulations of fact because the documents that Mr. Henry was producing were not organized and appeared to be duplicative. We held a telephone conference with the parties in April 2022, and confirmed the general accuracy of the Commissioner's complaints. We observed that, whatever Mr. Henry's good-faith intentions were about preparation for trial, his documents constituted a moving target to which his opponent could not respond. By our order of May 3, 2022 (Doc. 481), we set the case for trial beginning August 29, 2022, and we set deadline of August 1, 2022, for Mr. Henry to exchange additional documents with his opponent. Our orders of July 6 and 12, 2022 (Docs. 483, 486), reminded him of that August 1 deadline.

[*21] Notwithstanding the August 1 deadline, Mr. Henry made 16 filings of proposed exhibits (that he had not previously exchanged with the Commissioner) on August 2 and 3. (*See* Docs. 509–514, 516–525.) The Commissioner filed a motion for an order to show cause (Doc. 15), which we granted on August 3, 2022 (*see* Doc. 526), directing Mr. Henry to show by August 12, 2022, why we should not preclude his admission of those late exhibits into evidence at trial. Mr. Henry did not make any such filing in response to our order to show cause. Rather, on August 4–15, 2022, he filed 20 more untimely sets of "Proposed Trial Exhibits". (Docs. 527 and 528, 530–539, 541–548.) We therefore made absolute our order to show cause (*see* Doc. 552) and directed that Mr. Henry was precluded from relying on late evidence. We later made a minor modification to that preclusion. (*See* Doc. 558.) On August 23, 2022, Mr. Henry filed a motion for a fourth continuance (Doc. 559), saying that he needed more time to complete tasks that had in fact been ordered to be completed by August 1, 2022. We denied the motion (*see* Doc. 560), stating: "Mr. Henry has already been allowed, on multiple occasions, a remarkably generous amount of time to prepare for trial, and we will not delay the trial further."

*Trial and subsequent proceedings*

The case proceeded to trial on August 29 and 30, 2022. Mr. Henry called himself and Ms. Hunter-Henry as witnesses, and the Commissioner also called the IRS agent who had conducted the audit. Even though she was not a petitioner in this case, Ms. Hunter-Henry helped Mr. Henry in the preparation and presentation of his case.

At the conclusion of trial we did not immediately set a briefing schedule but instructed the parties to attempt to settle the case in whole or in part. (Doc. 619 at 434–41.) That attempt bore some fruit in May 2023 when the parties filed a stipulation (Doc. 612) that settled some issues. *See supra* note 2. The same month we ordered the parties to brief the case (and we extended the deadlines at Mr. Henry's request, *see* Doc. 620). Briefing was completed in November 2023.

In his opening brief, the Commissioner conceded the income that the IRS had determined above Mr. Henry's reporting on his returns (Doc. 623 at 42 n.4); and in his answering brief the Commissioner made partial concessions of some amounts (i.e., less than Mr. Henry contends) for three categories of deductions claimed by Mr. Henry: merchant banking fees, *see supra* p. 10, bank service fees, *see supra* p. 11, and

**[\*22]** payments remitted on behalf of clients as part of Savvy Bill Pay, *see supra* p. 7, for 2011 through 2014.

OPINION

I.    *Basic legal principles*

  A.    *Burden of proof*

As a general rule, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving them erroneous.  Rule 142(a); *see Welch v. Helvering*, 290 U.S. 111, 115 (1933).  In certain circumstances section 7491(a) may shift to the Commissioner the burden of proof on factual issues, but Mr. Henry does not argue that the burden of proof has shifted under that section. There are, however, two other exceptions to the general rule that are pertinent here:

First, as to fraud (asserted by the Commissioner in connection with the fraudulent failure-to-file addition to tax under section 6651(f)), the Commissioner has both the burden of production, *see* § 7491(c), and the burden of proof by clear and convincing evidence, *see* § 7454(a); Rule 142(b); *Clayton v. Commissioner*, 102 T.C. 632, 646 (1994).   The Commissioner acknowledges he bears that burden, and we discuss the issue below in Part II.G.2.b.

Second, Rule 142(a)(1) provides that, "in respect of any new matter, . . . [the burden of proof] shall be upon the respondent."  For the reasons we explain below in Part II.A, we conclude that the cancellation of indebtedness issue is new matter and that the Commissioner therefore bears the burden of proof on that issue.

  B.    *Ordinary and necessary business expenses*

Taxpayers generally bear the burden of proving that claimed business expenses were actually incurred and were "ordinary and necessary."  § 162(a); Rule 142(a); *see INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934).  Taxpayers are not allowed a deduction for personal, living, or family expenses except where specifically allowed in the Code. § 262(a).  Taxpayers bear the burden of substantiating the amounts of their deductions by keeping and producing records sufficient to enable the IRS to determine the correct tax liability.  *See* § 6001; Treas. Reg. § 1.6001-1(a).

**[\*23]** II.    *Analysis*

A.    *Income from cancellation of indebtedness*

The business income at issue is not in dispute, so we do not discuss it further.  The only disputed income is from cancellation of indebtedness, totaling $322,459 in 2011 and 2012.  Gross income generally includes income from the discharge of indebtedness. § 61(a)(12).  The rationale of this principle is that the cancellation of indebtedness provides the debtor with an economic benefit that is equivalent to income.  *See Friedman v. Commissioner*, 216 F.3d 537, 545 (6th Cir. 2000), *aff'g* T.C. Memo. 1998-196.  However, a cancellation of indebtedness may be excluded from income if, and to the extent to which, a taxpayer is insolvent.  § 108(a)(1).  A taxpayer is insolvent if he has an "excess of liabilities over the fair market value of assets."  § 108(d)(3).

After trial, Mr. Henry stipulated that he "*received* taxable income from cancellation of debt" (emphasis added), and his post-trial brief admits that at trial he "provided no information concerning his claim of insolvency".  He asks to be permitted to offer additional evidence that will show his insolvency, but we need not address that request because Mr. Henry does not need more evidence.

Rather, we have found that income from the cancellation of indebtedness in 2011 and 2012 was not included in the NOD.[12]  Thus, we can say here, as we said in *Tabrezi v. Commissioner*, T.C. Memo. 2006-61, 91 T.C.M. (CCH) 953, 955:

> Respondent went beyond the scope of the original deficiency determination by arguing . . . that the discharge of the [indebtedness] gave rise to COD income. . . . Therefore, respondent bears the burden of proof and must show, by a preponderance of the evidence, *that petitioners were solvent* under section 108(a)(1)(B) as of the calculation date.

---

[12] Nor was the cancellation of indebtedness issue pleaded in the Commissioner's answer but was raised for the first time in a pretrial memorandum. However, Mr. Henry stipulated the fact of his receipt of the income and in his briefs he did not object to the Commissioner's raising the issue.  We therefore treat the issue as having been "tried by express or implied consent of the parties", within the meaning of Rule 41(b)(1).

[*24] (Emphasis added.) The Commissioner did not undertake at trial to show Mr. Henry's solvency. Since the Commissioner had the burden on that point, his failure to prove it requires that we not sustain the determination as to cancellation of indebtedness income.

### B.    *Ayer's Place rental income*

Mr. Henry claims that the rental income reported from the Ayer's Place property should be recharacterized as repayment for a loan. We decline Mr. Henry's claim.

During trial Ms. Hunter-Henry testified that she contributed $100,000, along with money borrowed from eight to ten individuals, to "tak[e] over the management" from the owners of the Ayer's Place property. She alleges that this was done as some sort of investment to help people keep their homes when they were behind on payments. The ultimate goal of this transaction was allegedly for Mr. Henry and the other investors to receive their money back plus some return once the owner of the house was able to refinance it and repay the loans. Meanwhile, Ms. Hunter-Henry collected rental income from the property and allegedly paid for repairs to the unit. Ms. Hunter-Henry claimed in her testimony that the rental income was considered repayment on the money lent to purchase the property but that it was wrongly reported as rental income on the Form 1099 received by the Commissioner.

Aside from testimony stating that the Henrys lent money for the Ayer's Place property, Mr. Henry has not provided any evidence to support his request for recharacterization of the rental income. On their Schedule E for all years at issue, the Henrys reported as rental income the rent money they received. We do not have a deed, loan documents, or any other documentary evidence to corroborate Mr. Henry's position that he and Ms. Hunter-Henry ever lent any money, let alone $100,000, for the purchase of the Ayer's Place property. We are therefore unable to eliminate the possibility that this is yet another attempt by the Henrys to avoid their tax liability by turning their income into a "repayment" of a debt. They did not prove that the rent payments were loan repayments.

### C.    *Allocation of business income and deductions among entities*

Allocation of gross income and of deductions among Mr. Henry's various entities might in some circumstances affect the amount of the

[*25] income tax deficiency and of self-employment tax to be determined. We discussed this issue during a pretrial hearing (*see* Doc. 455 at 47–55). The Commissioner noted this issue in both of the pretrial memoranda he filed in this case. (*See* Doc. 48 at 13–14; Doc. 540 at 13.) In his opening post-trial brief, the Commissioner noted (Doc. 623 at 5 n.1) that Mr. Henry bears the burden to show the allocation among those entities, that he therefore should address that allocation in his own opening brief, and that the Commissioner would respond in his answering brief. Mr. Henry did not address the issue, and the Commissioner's answering brief therefore observed (Doc. 626 at 2 n.1) that "petitioner has conceded the character of his taxable income falls under Schedule C for purposes of this litigation". We agree.

D.    *Substantiation of business deductions*

Mr. Henry's post-trial brief (Doc. 624 at 50) explains its presentation on business expenses as follows:

> The Petitioner lists each of the business expenses that may not be common and describe the ordinary and necessary business expenses and give the reasons why and how Petitioner used the item or service in our businesses. The Petitioner is not going to list the common deductions that all businesses have, such as telephone expenses, and equipment.

That is, Mr. Henry expressly disclaimed any undertaking to discuss in his brief the justification for what he calls "common deductions". This approach interfered with his showing that he carried his burden of production, proof, and persuasion, which he does bear even as to those "common deductions".

1.    *Merchant banking fees*

A "merchant banking fee" is imposed on a business by a payment processing company when it processes an electronic payment. The Commissioner has conceded the existence and business character of those fees for which one of the statements produced by Mr. Henry contains abbreviations such as "BankCard", "Mtot Disc", "Discount", and "Indn", in amounts that total $98,142 for the four years at issue. *See supra* p. 10. The Commissioner reasons that Mr. Henry used payment processing companies to conduct his bill pay service and that no personal expense would incur a merchant bank fee.

[*26] However, Mr. Henry claims deductions in excess of those conceded by the Commissioner, *see supra* pp. 10–11, including amounts attributable to American Express and Authorize.net. But the additional amounts he claimed do not contain the same abbreviations that the Commissioner admitted are an indication of merchant banking fees, and Mr. Henry did not provide any explanation to show the character of these additional charges nor to warrant their deductibility. Therefore, we sustain the Commissioner's disallowance of the additional alleged merchant banking fees.

### 2. *Bank service fees*

A "bank service fee" is a monthly maintenance fee to maintain a bank account. The Commissioner has conceded the existence and business character of each of the monthly fees ($29.95 per month) on Mr. Henry's bank statements that are stated to be a "Monthly Maintenance Fee" because (he acknowledges) it is reasonable to expect that a business needs at least one bank account. (Mr. Henry's account commingled his personal and business income and expenses, but the Commissioner did not dispute the business need for and character of the account.) The amount conceded is $359 for each year at issue, or $1,436 total. However, Mr. Henry also claims a deduction for any amounts stemming from overdraft fees, chargebacks, and transfer fees. As is shown above on page 11, amounts totaling $28,784 that are not conceded by the Commissioner are still in dispute.

Mr. Henry has not provided sufficient evidence to demonstrate that the additional fees he claims were incurred as a result of his business activities and not in conjunction with his personal activities and expenses, nor has he demonstrated how those expenses would be ordinary and necessary business expenses. Therefore, we sustain the Commissioner's disallowance of the additional, unsubstantiated portion of the alleged merchant bank service fees.

### 3. *Advertising and web hosting*

Advertising and marketing expenses are those which are incurred to attract customers or clients to a business. Mr. Henry claims deductions for signs made for the purpose of advertising his businesses as well as "marketing" expenses, which are actually expenses for web hosting. As to the advertising expenses, Mr. Henry testified that he and Ms. Hunter-Henry posted signs to attract clientele to seminars where they would teach them about their business. Mr. Henry submitted lead

**[\*27]** sheets and bank statements listing payments to various businesses that his testimony obviously supports, such as "Fast Signs" and "Online Signs", and we allow deductions for those payments. Other payments, however, were made to entities such as Facebook, and without more information we are unable to determine what those payments were for. Therefore, we allow a deduction for advertising expenses only to those businesses whose purpose is readily identifiable by name. *See supra* pp. 12–13.

As to web hosting expenses, Mr. Henry testified and stated in his brief that he was in charge of designing and maintaining the websites for his and Ms. Hunter-Henry's businesses. The expenses for web hosting seem to be the cost for having a domain name and other domain-related expenses. Mr. Henry's evidence and testimony support that he made these payments in order to carry out his business, and we allow these deductions for web hosting. *See supra* pp. 12–13.

4. *Travel, meals and entertainment, business gifts, and listed property*

Certain expenses are subject to strict substantiation under section 274(d). Such expenses include those relating to travel, meals and entertainment, gifts, and "listed property" under section 280F(d)(4). § 274(d). For the years in issue, listed property included passenger automobiles and any other property used as a means of transportation. § 280F(d)(4). To comply with the strict substantiation rules, the taxpayer must have adequate records or sufficient evidence corroborating the amount of the expense, the time and the place the expense was incurred, the business purpose of the expense, and the business relationship of the taxpayer to any others benefited by the expense. § 274(d). To substantiate by adequate records, the taxpayer must maintain an account book, a log, a diary, or a similar record and documentary evidence to establish each element of an expenditure. Treas. Reg. § 1.274-5T(c)(2)(i).

Mr. Henry believes he is entitled to deductions for air and bus travel, hotels, gas, rental cars, car payments, car insurance and repairs, car wash, AAA, toll roads and parking, metro and bus fare, personal meals, meals for "private market receptions", and business gifts. The Commissioner disallowed all amounts claimed.

Mr. Henry's evidence to support his claimed deductions for these strict substantiation expenses is overall not helpful to his cause, and his

[*28] intermingling of business and personal accounts and finances dooms his contention that all of his claimed deductions in these categories are allowable. Mr. Henry collaborated with Ms. Hunter-Henry in teaching others to "convert your personal life into your business life and write it all off"; and this greatly undermines the credibility of both their record-keeping (such as it was) and their testimony at trial. Mr. Henry offered into evidence travel itineraries to destinations such as Sacramento (where Mr. Henry lived for a time) and Las Vegas, but he provided no explanation of a business purpose for any of his travel. Mr. Henry also submitted bank statements highlighting payments for bus and metro travel but again provided no explanation as to the business purpose for these expenses. That Mr. Henry evidently did to some extent conduct business in California and Maryland is not sufficient for our analysis because we simply do not know the actual purpose for which Mr. Henry flew or took a bus on any given occasion. Without a demonstrated business purpose, a taxpayer may not deduct expenses for travel. § 274(d). Therefore, we sustain the Commissioner's disallowance of Mr. Henry's travel expenses.

Mr. Henry also claims local transportation costs for all years at issue, citing supposed substantiation of expenses paid for metro travel, car insurance, car rentals in Maryland, and car payments and repairs. Commuter fare is not deductible as a business expense, Treas. Reg. § 1.162-2, and costs related to passenger automobiles must be substantiated with carefully kept logs or records, § 274(d). Mr. Henry did not submit any such logs or records. Therefore, we also sustain the Commissioner's disallowance of Mr. Henry's deductions for transportation expenses.

As to his claimed deductions for hotels, Mr. Henry explained that when he and his wife were in California, where the record shows they had a residence that they rented, they also rented rooms at a hotel in which to conduct their weekly seminars. According to Mr. Henry, the need for the hotel ceased once he and his wife secured a more appropriate office space. This explanation aligns with the fact that Mr. Henry did not report hotel expenses for 2013 or 2014. While this expense is labeled "hotels" (because the payments were in fact for hotel rooms), the purpose of the payments was to host business seminars (in hotel rooms), not to provide travel accommodations for the Henrys. Those seminars were an element in the Henrys' recruitment of clients. Therefore, we allow Mr. Henry's claimed deductions for the hotel expenses for years 2011 and 2012.

**[\*29]** Mr. Henry claims deductions for meals, both personal and those allegedly provided at the "private marketing receptions", which were apparently the presentations that Mr. Henry and Ms. Hunter-Henry hosted to recruit clients to their businesses. Mr. Henry provided no testimony regarding the business purpose of the meals, neither the personal nor the private marketing reception meals. Instead, he submitted to the Court receipts from the meals, often without any information regarding even who paid for the meal, much less the attendees and the business purpose for the meal. Given the Henrys' strategy regarding "anyway expenses", we are unconvinced by the evidence and lack of testimony before us that the personal meals claimed by Mr. Henry were anything beyond family dinners. While meals provided at the private marketing receptions might more plausibly support deductions, we are unable to determine whether there were even any attendees at presentations for which Mr. Henry submitted receipts for meals and, further, whether the meals purchased were, again, merely Mr. Henry's buying lunch for his family.

Finally, Mr. Henry claims the following deductions for "Marketing Gift Cards"—i.e., business gifts in the form of $25 gift cards that he allegedly gave to clients when they attended a seminar and brought with them a new, potential client:

| Year | Amount |
|------|--------|
| 2011 | $4,603 |
| 2012 | 2,639 |
| 2013 | 2,166 |
| 2014 | 1,412 |
| **Total** | **$10,820** |

Mr. Henry's sole evidence to support these deductions is receipts showing the purchases of the gift cards. Section 274(b)(1) limits the deduction of the cost of any business gift to $25 per recipient per year. A taxpayer claiming a business gift deduction must substantiate the cost and description of the gift, the date the gift was made, the business reason for the gift, and the business relationship to the taxpayer. Temp. Treas. Reg. § 1.274-5T(b)(5). While Mr. Henry provided receipts evidencing the purchase of the gift cards he later gave to clients, he does not meet his burden regarding the other substantiation requirements under the regulation. We do not know, because we have before us no evidence showing, whether the gift cards he purchased were ever in fact

[*30] given to clients or, if they were, whether more than one gift card was given to the same client in any given year, which would affect the deductibility of the claimed business gifts. We think it is likely that Mr. Henry may have used the cards for his personal expenses or for nondeductible gifts. Ms. Hunter-Henry's cynical presentation to her customers, videotaped by Mr. Henry, asked "how many do [you] give [your relative]? It is up to you." The lack of credible evidence prompts us to sustain the Commissioner's determination entirely disallowing the business gift deductions for all the years at issue.

### 5. *Cell phones, landlines, and inbound call center*

"Any charge . . . for basic local telephone service with respect to the [first] telephone line provided to any residence of the taxpayer shall be treated as a personal expense" and is not deductible. § 262(b). Mr. Henry reports expenses for multiple cell phone plans (MetroPCS, Verizon, T-Mobile, and Virgin) and landlines. We have before us bank statements, invoices, and call logs with unidentified phone numbers. His lists of expenses (Doc. 608 at 5–13) include entries for "Toll Free Line", "Business Cellular", "Land Line", "Fax Line", and "Long Distance". Mr. Henry did not provide further explanation, on brief or at trial, regarding the connection of these expenses to his businesses. We are not skeptical of the proposition that a business may have a need for multiple phone lines, but so may a family household. Mr. Henry reports expenses for "business cellular" and "business landline" plans across five different companies. Of these five different companies, Mr. Henry submitted account invoices for only two: a Verizon plan under the name of Ms. Hunter-Henry, and a Sprint plan under "L N S Marketing Concepts". No invoices for other plans are submitted.

Mr. Henry encouraged his clients to falsely characterize their personal expenses as business expenses, and we cannot rule out the likelihood that the Henrys themselves did just that in this instance for at least some of the reported phone expenses. As seen on page 11, Ms. Hunter-Henry would often pay her children's phone bills. Given the fact that most of the evidence Mr. Henry submitted to support these reported expenses is nothing more than bank statements showing payment to a phone company, we cannot be sure that most of the payments were for Mr. Henry's businesses but were instead for his children. On the other hand, a business does need to have telephone service, and we think that a cell phone plan issued under the name of a business was likely used for business purposes. Likewise, landline service at a professional address was likely for a business purpose.

**[\*31]** Therefore, we allow for cell phone expenses a deduction of $5,406 for 2011 and $1,656 for each of 2012 and 2013, and we allow $3,641 for the Verizon landline expense in 2013.

Mr. Henry also raised for the first time in his brief the issue of a deduction for an "inbound call center". We have no testimony from Mr. Henry regarding this expense, no amount reported by Mr. Henry, and no discernible evidence cited from among his thousands of submitted documents. Therefore, we disallow whatever amount is reported by Mr. Henry regarding an inbound call center expense.

### 6. *Office rent and home office*

#### a. *Office rent*

Mr. Henry claims deductions for rent paid for professional office space as well as for amounts paid for, and relating to, his residences. While Mr. Henry has not met any of the requirements to qualify for a deduction for home office expenses, we believe that he has met his burden as it relates to payments (in the amounts listed above at page 10) made to Brightleaf Properties and Essex Realty for the Henrys' rental of his professional offices. The properties rented in California and then in Maryland were professional office suites, and it is reasonable to conclude that that the Henrys' businesses would need office space out of which to work. We hold that he is entitled to deduct the four-year total of $56,380 that is set out above.

#### b. *Home office deduction*

A different analysis is required for the amounts allegedly paid for Mr. Henry's "home office".

Section 280A(a) disallows any deduction, even if otherwise allowable under the Code, with respect to the business use of a taxpayer's personal residence, except as otherwise provided in section 280A(c)(1). Section 280A(c)(1) provides, in relevant part, that subsection (a) shall not apply to disallow any item to the extent the item is allocable to a portion of the dwelling unit which is exclusively used on a regular basis "(A) as the principal place of business for any trade or business of the taxpayer", or "(B) as a place of business which is used by patients, clients, or customers in meeting or dealing with the taxpayer in the normal course of his trade or business". § 280A(c)(1)(A) and (B); *Robinson v. Commissioner*, 487 F. App'x 751, 754 (3d Cir. 2012), *aff'g* T.C. Memo. 2011-99.

**[\*32]** For deductions allowed under section 280A(c)(1), the taxpayer must establish that a portion of his personal residence was (1) exclusively used, (2) on a regular basis, (3) for one of the purposes enumerated in section 280A(c). *Hamacher v. Commissioner*, 94 T.C. 348, 353 (1990). The flush text of section 280A(c)(1) provides:

> [T]he term "principal place of business" includes a place of business which is used by the taxpayer for the administrative or management activities of any trade or business of the taxpayer if there is no other fixed location of such trade or business where the taxpayer conducts substantial administrative or management activities of such trade or business.

Several of these requirements defeat Mr. Henry's claim of a home office deduction.

First, as we have noted, Mr. Henry and his wife operated their businesses not only out of their residences in California and Maryland but also out of professional offices (i.e., "fixed locations") that they rented in California and in Maryland. Their use of these professional office suites during all years at issue makes it very unlikely that any home office that they used was ever their "principal place of business". It seems much more likely that Mr. Henry's deduction of household expenses is another instance of "convert[ing] your personal life into your business life and writ[ing] it all off".

Second, as far we can tell, Mr. Henry is claiming, as home office deductions, 100% of his household expenses. For example, for three of the years at issue,[13] Mr. Henry's post-trial brief seems to claim deductions for the entire "home office rent" of $22,380 for 2012, $36,000 for 2013, and $21,000 for 2014 (totaling $79,380). In addition, Mr. Henry seems to attempt to deduct the gross amounts of various other costs associated with the residential properties, from homeowners association fees to utility bills to landscaping. Under section 280A(c)(1), however, he could deduct at most the household expenses that correspond to the "portion" of the house that is used for business.

Third, Mr. Henry put on no evidence as to what that "portion" might be. While he offered copious amounts of documentation

---

[13] As far as we can tell, the record does not show why Mr. Henry's claim for 2011 omits "home office rent".

**[\*33]** attempting to show the expenses of his California and Maryland residences, he did not submit evidence or make argument that any part of either of his homes was used exclusively, on a regular basis, as his principal place of business.  Therefore, we sustain the Commissioner's disallowance of all home office expense deductions.

### 7.    *Casual labor by children and non-family*

#### a.    *Payments to non-family "contractors"*

Mr. Henry testified that he paid his contractors through PayPal, but the Commissioner demonstrated at trial that at least some payments claimed by Mr. Henry do not actually correspond to payments supposedly made to contractors.  We do not have any Form W–2 or Form 1099 before us to support any claimed "casual labor" payments made.

As we noted above, the only exception to this evidence is that which relates to payments made to Robert Half International in 2012 for services performed by Nancy Villalobos.  Mr. Henry submitted both invoices from Robert Half International and a bank statement showing two payments totaling $781 to Robert Half International.  An absence of a Form W–2 or a Form 1099 is not detrimental to Mr. Henry's claim on this amount because Robert Half International was the employer of Ms. Villalobos when she worked as a contractor for the Henrys, and it thus would have been the entity to issue either form.  Therefore, we find that Mr. Henry did make deductible payments of $781 in 2012 for services rendered by Nancy Villalobos.

However, regarding the other claimed "casual labor" payments, we remain unconvinced.  Forms 1099 or Forms W–2, where they are issued, show that the recipients are expected to report the income and give the IRS information by which it can confirm that the income was reported; and the issuance of the forms helps to assure that the payor really did pay the amounts as alleged.  On the other hand, the absence of the forms increases the likelihood that the payments may not ever really have been made or that they may not have been made for the business purpose alleged.  The PayPal payments to the supposed contractors on Mr. Henry's bank statements do not provide names that correspond to Mr. Henry's "lead sheets", and the Commissioner demonstrated at trial that at least some of the payments claimed by Mr. Henry may not have been made to contractors at all.  Therefore, we are unable to find that Mr. Henry made deductible payments for "casual

**[*34]** labor" to the non-family contractors, other than the $781 paid to Robert Half International.

b. *Payments to the Henrys' children*

Mr. Henry claims deductions for payments made to his children and several other "contractors" for "casual labor". We are largely unable to determine what, if any, payments were made for services rendered or were made in pursuit of the Henrys' "anyway expense" tax evasion strategy that they marketed to their customers. Ms. Hunter-Henry testified that she paid her children in cash or "payments in lieu of cash" for services they allegedly rendered for her business. Among the evidence submitted, there is no Form W–2 or Form 1099 that would support a finding that any of the Henrys' children performed work for their businesses. Instead, we have testimony provided by Ms. Hunter-Henry, payments made to PayPal, checks made out to the Henrys' children, or checks for the children's personal expenses, such as rent.

The payments most nearly plausibly made for business work performed by any of Mr. Henry's children is a total of about $500 recorded on the 2012 payroll log for January through March. The log lists work performed by Lawrence M. Henry and Velma Blackstone and the corresponding amount they earn for that task. However, we do not have any Form W–2 or Form 1099, and we cannot say that Mr. Henry proved it is more likely than not that even just the claimed payments made to Velma and Lawrence in 2012 were for services rendered for the businesses.

The Henrys also issued credit cards to two of their children that were apparently tied to an account that the Henrys used for their businesses. Allegedly, some of the children would "do errands" on behalf of Mr. Henry and Ms. Hunter-Henry using these cards. On that basis, Mr. Henry claims a deduction for some payments made under the cards, although from the testimony, briefs, and submitted evidence we are unable to determine what the amount of that deduction would be. However, the amount is unnecessary as we disallow any amount claimed by Mr. Henry for expenses incurred by any of the children on such credit cards for the simple reason that we cannot determine whether any amounts paid were for deductible business expenses or were instead for the personal expenses of the children.

**[*35]**     8.     *Referral fees*

Mr. Henry claims a deduction for "referral fees" of $900 to three people ($300 each) as supposed "commissions" for referring new clients to Mr. Henry's business. He raised this deduction for the first time, without elaboration, in his opening brief. By way of evidence, he offered three canceled checks for $300 made out to three individuals whose names we do not recognize, all with "memo" lines specifying that the payments are for "commission". However, because we have no testimony relating to these payments (and have only three checks before us), we are unable to determine whether the payments were made for their purported reasons, or whether instead this was yet another way for Mr. Henry to turn his "anyway expense" into deductible payments. Therefore, we do not allow a deduction for the alleged "referral fees".

     9.     *Clothing*

The cost of clothing may be deductible as a business expense only if the clothing is "of a type specifically required as a condition of employment," if it is "not adaptable to general usage as ordinary clothing," and if "it is not so worn." *Pevsner v. Commissioner*, 628 F.2d 467, 469 (5th Cir. 1980), *rev'g* T.C. Memo. 1979-311; *accord Yeomans v. Commissioner*, 30 T.C. 757, 767 (1958). Mr. Henry did not provide through testimony, discussion on brief, or evidence any information about the nature of the clothing he purchased and had dry cleaned. It seems likely to us, therefore, that this is an example of another "anyway expense" reported by Mr. Henry. Thus, we disallow any deduction for clothing or dry cleaning expenses.

     10.     *Taxes, licenses, and business insurance*

Mr. Henry claims deductions for amounts paid for taxes, "licenses" (filing of articles of incorporation and filing a trademark), and business insurance. Regarding amounts paid for taxes, Mr. Henry has submitted no evidence to support the purpose of the "taxes". They were payments made to a municipality with no testimony or explanation on brief as to what the payments were for. We do not allow the deduction.

However, Mr. Henry did make payments to the State of Maryland to file articles of incorporation and to register a trademark, evidenced by a receipt and letter to that effect for both filings. He also provided statements supporting his claimed deduction for his business insurance.

**[\*36]** We therefore allow a deduction of $328 for "licenses" and $1,827 for business insurance.[14]

### 11.  *Deductions for Savvy Bill Pay remittance*

The Commissioner conceded two-thirds of the deductions Mr. Henry claims for payments remitted on behalf of clients of Savvy Bill Pay,[15] but the other one-third of the alleged payments remains in dispute. That is, for the four years at issue, Mr. Henry claims "Savvy Bill Pay" remittances—which he paid either by check or by debit card— totaling approximately $3.5 million; the Commissioner concedes about $2.3 million; and about $1.2 million remains in dispute. *See supra* p. 7.

Mr. Henry provided multiple "lead sheets" (produced either by Savvy Bill Pay or by himself) accompanied by pages of bank statements that purport to demonstrate the amounts that Savvy Bill Pay paid on behalf of its clients. Amounts shown on Mr. Henry's lead sheets supposedly correspond with amounts on the submitted bank statements to prove that the expenses were not Mr. Henry's personal expenses and that he actually paid the amount he received from a client to a creditor of that client. However, keeping in mind the Henrys' notion of "convert[ing] your personal life into your business life and writ[ing] it all off," we find Mr. Henry's evidence of his Savvy Bill Pay expenses unconvincing. Even where an alleged Savvy Bill Pay payment is duly listed on his lead sheets and is linked to a payment entry on a bank statement, we have no way to eliminate the possibility that it was in fact a payment that Mr. Henry made on his own behalf, disguised as a client payment, as a means of "writing off" his personal expenses as if they were business expenses. We conclude that some unknowable portion of

---

[14] Mr. Henry also claims a deduction for payments made for life insurance supposedly by his businesses for Key Man Life. However, we have no testimony, discussion on brief, or evidence to support that payments for an ostensible key man life insurance for the business were not in fact merely personal payments made for life insurance for which Mr. Henry's relatives were beneficiaries. Mr. Henry did not offer the insurance policy into evidence. We disallow those claimed "Key Man Life" deductions and do not address the issue further.

[15] The Commissioner is not obliged to justify the amount of his concession, and he does not do so. That is, he does not provide details as to whether he determined any particular alleged Savvy Bill Pay payments to be legitimate nor how he otherwise decided what amount to concede for each year or why. We therefore simply look to Mr. Henry to sustain his burden of proving for each year a larger total than the Commissioner conceded. We conclude he did not do so.

[*37] the alleged Savvy Bill Pay client expenditures were in fact expenditures for the benefit of the Henrys.

Upon reviewing Mr. Henry's documents, we see that amounts claimed as client "payments" made by debit card do seem to correspond to payments appearing on Mr. Henry's bank statements, that the bank statements list payees (but not Savvy Bill Pay clients), and that the payees on the bank statements match the payees listed by Mr. Henry. However, as to client payments allegedly made by check, there are check entries that Mr. Henry characterizes as Savvy Bill Pay payments that provide no information beyond the check number, the date, and the amount of the check itself.[16]  And to complicate the analysis further, Mr. Henry's commingling of his finances with the finances of his businesses makes impossible a siloed analysis of transactions only from Savvy Bill Pay.  Instead, we are presented with a veritable haystack and are asked to find the hundreds of needles within.  We decline the assignment, *see Venuto v. Commissioner*, T.C. Memo. 2017-123, at *9 ("The Court will not sort through the voluminous evidence to decide whether petitioner substantiated each and every expense he claimed"); *Akey v. Commissioner*, T.C. Memo. 2015-227, at *21, and instead we hold Mr. Henry to his obligation to demonstrate his entitlement to deductions.  He did not do so.

In response to the Commissioner's criticisms about defects in his proof of the particulars of his expenditures, Mr. Henry argues broadly that the revenue from Savvy Bill Pay was necessarily and directly offset by the payments remitted on behalf of his clients, so that (he says) one can safely assume that the actual total of client payments would approximate the Savvy Bill Pay income.  But it is not so, and he does not literally contend that it is so:  Rather, in his post-trial brief (Doc. 624 at 29–30) he asserts that his Savvy Bill Pay expenses constituted not 100% of his Savvy Bill Pay income but instead only 85% for 2011, 87% for 2012, 93% for 2013, and 91% for 2014.  He also acknowledges that he

---

[16] Mr. Henry's supporting evidence for the check expenses of Savvy Bill Pay varies widely from month to month.  For some months there are scanned copies of checks with named payees (although there is no "memo" description indicating a client's name nor even that the check is remitting payment on behalf of any client) while for other months, there are no scanned copies of the claimed checks.  Even for months with scanned copies of checks, there are not copies of all checks reported as Savvy Bill Pay expenses.  For example, Mr. Henry listed 48 checks on a lead sheet for the month of January 2012 paid by Savvy Bill Pay, but he offered only 21 images of checks for that month, not all of which even correspond to the checks listed on the lead sheet.

[*38] charged each client a total that consisted not only of the payments he was to make on its behalf but also of a processing fee and some flat amount per transaction. Of necessity, therefore, to the extent of those other amounts, the Savvy Bill Pay income would *not* have been offset by client payments; rather, it would seem that some portion of the Savvy Bill Pay revenue either would have consisted of the merchant banking fees (for which we have already allowed deductions, so that one *cannot* assume a duplicative deduction for payment of a client expense) or would have been a profit source of the Savvy Bill Pay business. The record before us does not show what those amounts are and what portion of the Savvy Bill Pay income they may have constituted.

Mr. Henry has not provided any reason, through testimony or in his briefs, why this deduction should be any higher than the Commissioner has conceded, and we are not obligated to "undertake the work of sorting through every piece of evidence that [Mr. Henry] has provided in an attempt to find support for his reported expenses". *See Amundsen v. Commissioner*, T.C. Memo. 2023-26, at *6. Consequently, we sustain the Commissioner's disallowance of deductions attributable to payment remittance for Savvy Bill Pay clients in excess of what the Commissioner has conceded.

### 12. *Other Deductions*

We briefly address other deductions not previously discussed in this opinion. Mr. Henry's brief discusses some of his claimed deductions and presents charts that list both those claimed deductions and other deductions that are not discussed in the narrative of the brief.[17] For Mr. Henry to carry his burden to prove his entitlement to a deduction for a business expense, it was generally incumbent on him (1) to assert a claim for the deduction, (2) to produce credible documentation to substantiate both the expenditure and its business purpose, and (3) to provide credible testimony of that business purpose where it was not either stipulated or evident from the documentation. In general we disallow deductions where he has failed to do so.

There are some reported expenses that Mr. Henry did list *and* discuss in his briefs, but as to which he had given no testimony during trial. That is, he gave supposed information about these items as

---

[17] We consider issues not raised in Mr. Henry's opening brief to have been abandoned. *See Clay v. Commissioner*, 152 T.C. 223, 235–36 (2019), *aff'd*, 990 F.3d 1296 (11th Cir. 2021); *Hockaden & Assocs. v. Commissioner*, 84 T.C. 13, 16 n.3 (1985), *aff'd*, 800 F.2d 70 (6th Cir. 1986).

**[\*39]** unsworn narrative in his briefs but had given no sworn testimony at trial. These expenses include those for office moving, a "business" storage unit, seminars and training, and online marketing ads. His documentary evidence for these expenses resembles much of the evidence that he submitted for his other expenses that we have disallowed: receipts without context and highlighted and notated bank statements. We disallow these expenses because, as with many of the other expenses he reports, we lack credible testimony and are unable to determine whether these are legitimate business expenses or are another implementation of the Henrys' "anyway expense" strategy.

There are other claimed deductions that are listed but not discussed in Mr. Henry's briefs. These include some for office equipment, software, video conferencing, legal fees, prepaid legal fees, finance charges, additional cash advances, books and subscriptions, and postage. At trial he did not offer testimony on these items. For some of these items he offered documentation that does show the fact of an expenditure but does not show its business purpose. Mr. Henry is quite right that, for example, postage is a deductible "common" expense incurred by many businesses; but it is also a non-deductible expense commonly incurred by many households. Someone with an announced strategy of characterizing personal expenses as business expenses faces a difficult burden to persuade us that a given expense was in fact a business expense. Lacking supporting testimony and an express explanation in his briefs, we deny deductions for those items.

However, we cannot say it is impossible that there might be an expense for which we have not allowed any deduction but for which a sufficiently meticulous review of the record would show that Mr. Henry did submit documentary evidence for it and did give testimony about it at trial and did report and discuss the expense in his briefs. But Mr. Henry's disorganized presentation made such a meticulous review impractical. As we explained to Mr. Henry eight months before trial: "I can't figure out how these documents relate to what the parties are disputing unless the parties show me." As we read his post-trial briefs—which ought to have linked the exhibits and the testimony to his contentions—they instead include tangential, unsupported, and generally unhelpful arguments. Even if we make allowances for his being self-represented, Mr. Henry's performance at trial requires the conclusion that some of his claims were abandoned at trial. We therefore did not consider such claims made by Mr. Henry in his post-trial briefs without visible evidentiary support.

**[\*40]**  E.    *Ayer's Place repairs*

Section 212(2) allows for a deduction of all the ordinary and necessary expenses paid or incurred during the taxable year for the management, conservation, or maintenance of property held for the production of income.  A taxpayer may deduct under section 212 properly substantiated repair expenses for properties held out for rent.

A taxpayer claiming a deduction on a federal income tax return must demonstrate that the deduction is allowable pursuant to a statutory provision and must further substantiate that the expense to which the deduction relates has been paid or incurred.  § 6001; *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976).

Mr. Henry claims deductions for payments allegedly made to repair the Ayer's Place property to maintain its habitability.  As discussed above, *see supra* p. 24, we do not know the extent to which Mr. Henry owned the Ayer's Place property, if at all.  The only evidence submitted to support Mr. Henry's claimed deductions is faded receipts and a handful of checks with the "memo" line reading "Ayer's Place" or "Section 8 Repairs".  For these reasons, we find a lack of credible evidence to allow a deduction for repairs made to the Ayer's Place property.

F.    *Charitable contributions*

Section 170(a) allows as a deduction any charitable contribution made within the taxable year.  During all years at issue, a taxpayer could only claim a deduction for charitable contributions only if he itemized his deductions.  To qualify as a deduction, the contribution must be made to a donee organization described in section 170(c), including, inter alia, "[a] corporation, trust, or community chest, fund, or foundation . . . organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes".  Deductions for charitable contributions are allowable only if verified under the regulations prescribed by the Secretary.  § 170(a)(1).  Charitable contributions of cash or property of $250 or more must be substantiated by a contemporaneous written acknowledgment from the donee.  *See* § 170(f)(8); Treas. Reg. § 1.170A-13(f)(1).  A CWA is "contemporaneous" if it is obtained by the taxpayer on or before the earlier of the date the taxpayer files the original return for the taxable year of the contribution or the due date (including extensions) for filing the original return for

**[\*41]** the year. § 170(f)(8)(C); Treas. Reg. § 1.170A-13(f)(3). That acknowledgment, which must be furnished by the donee, must (1) state the amount of cash and describe other property contributed, (2) indicate whether the donee organization provided any goods or services in consideration for the contribution, and (3) provide a description and good faith estimate of the value of any goods or services provided by the donee. § 170(f)(8)(B); Treas. Reg. § 1.170A-13(f)(2).

Mr. Henry claims Schedule A deductions for charitable contributions totaling $5,438 for the years at issue. Mr. Henry alleges he paid $4,467 to the Nation of Islam, $871 to the Rev. Farrakhan individually, and $100 to the Scarlet Saints. Mr. Henry submitted receipts produced by the donee for only a handful of contributions (totaling $1,160) that he made to the Nation of Islam during 2011 through 2013; he did not submit any receipts for 2014.

All remaining evidence consists of bank statements and several checks. We do not have enough evidence before us to enable us to determine whether the payments made to the individual or the Scarlet Saints qualify as charitable contributions under section 170, and we therefore disallow those deductions. Regarding the payments made to the Nation of Islam, we conclude that receipts executed at the time of the donations qualified as a CWA. For that reason, we find that Mr. Henry has offered sufficient evidence to support a deduction for charitable contributions of $1,160. However, because Mr. Henry claimed (and we will allow) the standard deduction on his late returns for years 2011 through 2014, he is unable to also claim a deduction for charitable contributions, which could be deducted only if one itemized his deductions for those years.[18] Consequently, we find that Mr. Henry is entitled to no deduction for charitable contributions for any year at issue.

G. *Additions to tax*

The Commissioner determined in the NOD additions to tax under section 6651(a)(2) for failure to pay, under section 6651(f) for fraudulent failure to file (or, in the alternative, under section 6651(a)(1) for non-fraudulent failure to timely file), and under section 6654 for failure to

---

[18] Congress allowed a temporary exception to this limitation on charitable contribution deductions when it amended section 170(p) in 2020. For any taxable year beginning in 2021, section 170(p) allows a taxpayer to claim some charitable contributions even when claiming the standard deduction. For the years at issue, however, there was no such exception.

[*42] pay estimated income tax for all relevant years. For the following reasons, we find that Mr. Henry is liable for section 6651(a)(2) and 6654 additions to tax, and that he is liable not for the section 6651(f) fraudulent failure-to-file addition to tax but instead for the alternative section 6651(a)(1) addition for a non-fraudulent failure to file.

### 1. *Section 6651(a)(2) failure to timely pay*

Under section 6651(a)(2), an addition to tax is imposed for failure to timely pay the amount shown as tax on a return. (The addition is not imposed where there is "reasonable cause", but Mr. Henry has stipulated the absence of reasonable cause. *See supra* note 3.) The amount of the addition to tax is 0.5% of the amount of tax shown on the return, with an additional 0.5% for each month the return is delinquent, not to exceed 25% in the aggregate. § 6651(a)(2).

Mr. Henry did not submit returns prior to receiving the NOD. For that reason, the Commissioner created SFRs pursuant to section 6020(b) for 2011–2014 which each showed amounts owed for each year. For purposes of section 6651(a)(2), SFRs are treated as returns that trigger the accrual of the addition to tax for failure to pay tax shown on a return. § 6651(g)(2). The Commissioner bears the burden of producing evidence that the addition to tax under section 6651(a)(2) is appropriate. *See* § 7491(c). The Commissioner has submitted signed 6020(b) certifications for 2011–2014, and Mr. Henry does not challenge their validity. Likewise, Mr. Henry does not challenge that he has paid the amount shown on the SFRs. Therefore, because an amount of tax will be due for each year at issue (in an amount to be recalculated under Rule 155), Mr. Henry will be liable for additions to tax under section 6651(a)(2).

### 2. *Section 6651(a)(1) and (f) failure to file*

Section 6651 imposes two alternative additions to tax that penalize a failure to file a return—i.e., under section 6651(a)(1) a maximum addition of 25% for failure to file, and under section 6651(f) a maximum addition of 75% if the failure to file is fraudulent. Liability under either subsection arises from the late filing of a return (which here is an undisputed fact) and the absence of "reasonable cause" (which absence is stipulated here).

**[\*43]**                              a.       *Section 6651(a)(1)*

Section 6651(a)(1) authorizes the imposition of an addition to tax for failure to file a timely return (unless the taxpayer proves that such failure is due to reasonable cause and is not due to willful neglect). The amount of the addition is a percentage of the amount of tax required to be shown on the return—5% per month up to five months, for a maximum of 25% (but after reducing the amount by the withholding credits).  An addition to tax under section 6651(a)(1) is an alternative to the greater addition to tax imposed under section 6651(f).  Because, as we discuss in the next section, Mr. Henry is not liable for the greater addition to tax under section 6651(f), we hold that he is liable instead for the lesser addition to tax under section 6651(a)(1).

b.       *Section 6651(f)*

Under section 6651(f), the addition to tax imposed under section 6651(a)(1) is increased to 15% (rather than 5%) for each month the return is delinquent, up to a total of 75% (rather than 25%), if "the failure to file any return is fraudulent".  The Commissioner argues for that addition enhanced for fraud.  In applying section 6651(f), we consider essentially the same elements as when considering the imposition of the fraud penalty under section 6663.  *See Clayton*, 102 T.C. at 653.  Fraud under section 6663 "may be proved by circumstantial evidence and from reasonable inferences drawn from the facts because direct proof of the taxpayer's intent is rarely available. . . . The intent to conceal or mislead may be inferred from a pattern of conduct." *Niedringhaus v. Commissioner*, 99 T.C. 202, 210–11 (1992).  Facts that show this "intent to conceal or mislead" are called "badges of fraud", and the often-quoted non-exclusive list of such badges tallies them as follows:

> (1) Understatement of income; (2) inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealment of assets; (6) failure to cooperate with tax authorities; (7) filing false Forms W–4; (8) failure to make estimated payments; (9) dealing in cash; (10) engaging in illegal activity; and (11) attempting to conceal illegal activity.

*Id.* at 211.

However, whereas section 6663 imposes a penalty for a knowing *misrepresentation* of the truth in a filed return in order to evade tax,

**[\*44]** section 6651(f) imposes a penalty only when there is a knowing *concealment* of a material fact by the *non*-filing of a return in order to evade tax. *Mohamed v. Commissioner*, T.C. Memo. 2013-255, at \*20–21. That is to say, for purposes of the section 6651(f) addition to tax, the taxpayer must be shown to have deliberately failed to file his return timely, knowing that, by doing so, he was concealing the fact that he had received income subject to tax. *See Bennett v. Commissioner*, 30 T.C. 114, 120, 122 (1958). Consequently, while "we examine the same badges of fraud we used when considering the imposition of the fraud penalty . . . under section 6663(a), . . . we necessarily focus on [the taxpayer's] *decision* not to file [his] return when due. If that *decision* was made with the intent to evade tax, then the addition to tax under section 6651(f) may properly be imposed". *Enayat v. Commissioner*, T.C. Memo. 2009-257, 2009 WL 3763085, at \*24 (emphasis added).

On brief and during trial, the Commissioner provided evidence and argument that might support a finding that the Henrys' businesses were counseling their clients to file fraudulent returns; Ms. Hunter-Henry provided tax advice to clients with the aim to avoid tax liability and "pay the IRS without using your money" and encouraged clients to falsely characterize their personal expenses as deductible business expenses. But we do not address here any fraud that might have been committed by their clients, nor any criminal liability that might arise from conspiring with them to do so. *See* 18 U.S.C. § 371. We do not consider here Ms. Hunter-Henry's failure to timely file a return, but only Mr. Henry's failure. We do not consider false deductions claimed on or omissions of income from the returns that the Henrys eventually, belatedly, filed in April 2019, but only Mr. Henry's *failure to file* returns for 2011–2014 when they were due in the succeeding years (the latest being the 2014 return due on extension in October 2015).

To prevail under section 6651(f), the Commissioner is obliged to prove by clear and convincing evidence that Mr. Henry *failed to file* his returns with the intent to conceal his tax liabilities. But the Henrys conducted all of their business through payment processing entities that issued Forms 1099 to them for each year at issue. Mr. Henry knew that the issuers were reporting his income to the IRS. We cannot rule out the substantial possibility that Mr. Henry, aware that his income was being reported to the IRS, did not think that he was able to conceal much of anything from the IRS.

Moreover, Mr. Henry was a man with a high school diploma who relied on his wife—the "tax pro" with a juris doctorate who actually

[*45] performed the tax services of the businesses—to file their tax returns each year. He accepted her assurances that they had loss carryforwards that would reduce their income tax liabilities to zero and that this zero liability trumped their obligation to file a return. It is easy to argue that this was negligent on Mr. Henry's part; but the Commissioner has not shown us "clear and convincing evidence" that it was fraudulent.

The Commissioner has not met his burden to prove that Mr. Henry actively intended to evade his tax liability by failing to file his return, and we therefore do not find Mr. Henry liable for any additions to tax under section 6651(f).

3. *Section 6654 failure by individual to pay estimated income tax*

Section 6654(a) provides for an addition to tax for an individual's underpayment of estimated tax. In advance of the due date of the income tax return, estimated income tax must be paid quarterly in an amount equal to 25% of the lesser of (1) 90% of the tax shown on the current year's tax return (or 90% of the tax if no return is filed) or (2) if the taxpayer filed for the previous year, 100% of the tax shown on the prior year's tax return. *See* § 6654(c) and (d)(1). To meet his burden of production, the Commissioner must show that Mr. Henry had an obligation to make estimated tax payments. *See Wheeler v. Commissioner*, 127 T.C. 200, 211–12 (2006), *aff'd*, 521 F.3d 1289 (10th Cir. 2008). That is, the Commissioner must introduce evidence of whether Mr. Henry filed a tax return for the prior year (he did not do so as to any of the years at issue) and whether he had a tax liability for each of the years at issue (he did have a liability). *See id.* The due dates of the required estimated payments for a calendar year taxpayer are April 15, June 15, and September 15 of the calendar year in question and January 15 of the following year, § 6654(c)(2), but Mr. Henry admits that he did not pay estimated quarterly taxes for 2011–2014. Mr. Henry's assertions regarding payments he made years later, after 2019, on the basis of his suppositions about the amounts of his tax liabilities, do not alter our determination here because these payments were made delinquently. Therefore, we sustain the additions to tax under section 6654 for failure to pay estimated income tax.

**[\*46]** *Conclusion*

For the tax years 2011 through 2014, we hold that Mr. Henry is not liable for tax on cancellation of indebtedness income but is liable for tax on the Ayer's Place rental income. As to deductions, we hold that he is entitled only to relatively small amounts, set out above, beyond those the Commissioner already conceded.

As to additions to tax, we hold that Mr. Henry is not liable for additions to tax under section 6651(f) for fraudulent failure to file his returns, but we do hold him liable for additions to tax under section 6651(a)(1) for (non-fraudulent) failure to timely file, under section 6651(a)(2) for failure to pay, and under section 6654 for failure to pay estimated tax.

To reflect the foregoing,

*Decision will be entered under Rule 155.*